UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

———————————————— x
                                          :
TIM AULT, derivatively on behalf of       :    Civil Action No.
CENTURYLINK, INC.,                        :
                                          :    **VERIFIED SHAREHOLDER**
                 Plaintiff,               :    **DERIVATIVE COMPLAINT**
                                          :
          vs.                             :    DEMAND FOR JURY TRIAL
                                          :
GLEN F. POST, III; R. STEWART EWING,      :
JR.; DAVID D. COLE; SUNIT S. PATEL;       :
JEFFREY K. STOREY; MARTHA H.              :
BEJAR; VIRGINIA BOULET; PETER C.          :
BROWN; KEVIN P. CHILTON; STEVEN T.        :
CLONTZ; T. MICHAEL GLENN; W. BRUCE        :
HANKS; MARY L. LANDRIEU;                  :
HARVEY P. PERRY; MICHAEL J.               :
ROBERTS; and LAURIE A. SIEGEL,            :
                                          :
                 Defendants,              :
                                          :
          -and-                           :
                                          :
CENTURYLINK, INC., a Louisiana            :
corporation,                              :
                                          :
                 Nominal Defendant.       :
                                          :
———————————————— x

By and through undersigned counsel, Plaintiff Tim Ault ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant CenturyLink, Inc. ("CenturyLink" or the "Company") against certain current and former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, corporate waste, and insider selling. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by CenturyLink and other related parties with the SEC; (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on CenturyLink's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from three securities fraud class action lawsuits consolidated under *Craig v. CenturyLink, Inc., et al.*, Case No. 3:17-cv-01005-SMH-JPM (W.D. La.) (collectively, the "Securities Class Action") which were further consolidated into the related pending multidistrict consolidated action, *In re: CenturyLink Sales Practices and Securities Litigation*, Case No. 0:17-md-02795 (D. Minn.) (the "Consolidated Action"); and (e) review of other publicly available information concerning CenturyLink and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of the Company that seeks to remedy wrongdoing by CenturyLink's board of directors (the "Board") and certain of the Company's senior officers (collectively, the "Individual Defendants") between at least March 1, 2013 and the present (the "Relevant Period"). During the Relevant Period, the Individual Defendants breached their fiduciary duties owed to CenturyLink and its shareholders and

committed other violations of law by, *inter alia,* making or causing the Company to issue materially false and misleading statements and/or omit material information from its public filings and communications with analysts and investors, the disclosure of which would have made such filings and communications not misleading.

2.     CenturyLink is headquartered and incorporated in Louisiana, and is a communications company providing services to residential, business, wholesale, and governmental customers in the United States.  The Company offers broadband, Ethernet, colocation, video entertainment, and satellite digital television services to customers in more than 60 countries and is now the second largest U.S. communications provider to global enterprise customers.

3.     Prior to CenturyLink's merger with Level 3 Communications, Inc. ("Level 3"), which was completed on November 1, 2017, the Company's Consumer segment generated approximately one-third of CenturyLink's revenues.  The Company's Consumer segment focused on residential customers, offering products and services including broadband, wireless, and video services (including Prism TV services), as well as legacy services such as local and long-distance telephone lines.

4.     The Company marketed its products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing, and third parties.  The Company's business strategy relied on "bundling" its products – i.e., providing customers with a comprehensive set of products and services purportedly to "enhance customer loyalty." CenturyLink emphasized "customer-oriented sales, marketing and service" in its sales approach to residential customers.

5.      During the Relevant Period, the Individual Defendants made and caused the Company to disseminate false and misleading statements to the investing public concerning the Company's business model, prospects, and business practices, and its financial and internal controls.  Specifically, they caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) CenturyLink's aggressive marketing strategy relied on false information to lure and retain customers; (ii) the Company's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (iii) accordingly, the Company's revenues were the product of illicit conduct and unsustainable; (iv) the foregoing illicit conduct was likely to subject CenturyLink to heightened regulatory scrutiny; (v) CenturyLink had inadequate corporate financial reporting resources, inadequately assessed the risks associated with the Company's financial reporting, and failed to maintain effective internal controls over financial reporting; and (vi) as a result of the foregoing, CenturyLink's public statements were materially false and misleading at all relevant times.

6.      The truth concerning the misconduct in the Company's business practices was concealed from shareholders until at least June 16, 2017, when *Bloomberg* published an article entitled, "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme."  The *Bloomberg* article reported, in relevant part:

> A former CenturyLink Inc. employee claims she was fired for blowing the whistle on the telecommunications company's high-pressure sales culture that left ***customers paying millions of dollars for accounts they didn't request***, according to a lawsuit filed this week in Arizona state superior court.
>
> *            *            *
>
> The plaintiff, Heidi Heiser, worked from her home for CenturyLink as a customer service and sales agent from August 2015 to October 2016.  The suit claims she was fired days after notifying Chief Executive Officer Glen Post of the alleged

scheme during a companywide question-and-answer session held on an internal message board.

The complaint alleges *CenturyLink "allowed persons who had a personal incentive to add services or lines to customer accounts to falsely indicate on the CenturyLink system the approval by a customer of new lines or services." This would sometimes result in charges that hadn't been authorized by customers*, according to the complaint.

*       *       *

Heiser's complaint alleges that she became increasingly concerned about what she observed at CenturyLink after news of Wells Fargo & Co.'s regulatory troubles broke in September.  In that case, Wells Fargo employees opened deposit and credit card accounts without customers' consent to earn incentives and meet sales goals. Without admitting wrongdoing, Wells Fargo ended up firing more than 5,000 employees and agreeing to pay $185 million in fines, in addition to compensating customers for fees related to the unauthorized accounts.

*The complaint likens what Heiser said CenturyLink sales agents did to the Wells Fargo scandal and estimated the alleged unauthorized fees amounted to "many millions" of dollars.*  She says her concerns were bolstered by posts she had read on review websites.

A review of Yelp and Pissed Consumer finds evidence of irate customers.  "They signed me up unauthorized," wrote Sierrah U. of Bend, Ore., on Yelp in February 2015.  "I was talking to someone interested in signing up two weeks ago after realizing my modem was incapable I told the guy I didn't want to sign up and I would call back later if I was still interested, he got really upset hung up on me. Two weeks later I receive a bill!  With a ton a fees, I don't even have internet with them!"

*When a customer complained about an unauthorized charge, customer service and sales agents like Heiser were directed "to inform the complaining customer that CenturyLink's system indicated the customer had approved the service,"* according to the complaint, and as a result "it was really the customer's word against CenturyLink."

"CenturyLink is going to be in a world of hurt if this turns out to be true," said Roger Entner, an analyst with Recon Analytics.

*Initially, Heiser told her direct superiors about her suspicions and was told in response to her complaints to "stay positive and not to mention her concerns again,"* according to the complaint.  Heiser didn't report her concerns to the Federal Communications Commission or the Occupational Safety and Health Administration, a division of the U.S. Department of Labor.

*       *       *

- 4 -

"When sales targets are unrealistic and employees' livelihoods are at stake, some people are going to take shortcuts," said Entner, the telecom analyst. "Companies have the responsibility to make sure the goals are realistic. You don't want to drive people to break the law."[1]

7.     In response to these shocking revelations, the price of CenturyLink shares dropped $1.23 per share, to close at $25.72 per share on June 16, 2017, a decline of nearly 5%, on volume of 43 million shares.

8.     On June 19, 2017, after *Bloomberg* reported that a consumer complaint, based on the whistleblower complaint, had also been filed against CenturyLink, alleging fraud, unfair competition, and unjust enrichment, CenturyLink's share price declined another $0.36 per share to close at $25.36 per share.

9.     Since these revelations, the price of the Company's stock has continued to decline, closing at a low of $13.62 per share on November 27, 2017. On April 20, 2018, CenturyLink stock closed at $17.61 per share, a decline of more than 35% from the closing price on June 14, 2017, the day that Ms. Heiser's lawsuit was filed, representing a loss of over $10 billion in market capitalization since the truth started to come to light.

10.     In accordance with Louisiana law,[2] on September 6, 2017, Plaintiff made a written demand (the "Demand") on CenturyLink's Board of Directors ("Board") to investigate and take the necessary legal action against those responsible for the damages the Company has suffered.

11.     On April 13, 2018, counsel for the Board notified Plaintiff that the Special Litigation Committee ("SLC") appointed by the Board to investigate the allegations made in the Demand had "determined that it is not in the best interest of CenturyLink to pursue litigation

---

[1]  Unless otherwise noted, all emphasis has been added by Plaintiff.
[2]  CenturyLink is a Louisiana corporation.

against any Directors, Officers, or employees of the company, or to act on any of the demands made on the company." Accordingly, the SLC rejected Plaintiff's Demand.

12.    As explained in further detail below, the Board has acted on an uninformed basis and has unreasonably refused Plaintiff's Demand.  In light of the Board's unreasonable refusal of Plaintiff's Demand to investigate and remediate harms caused to the Company, Plaintiff now rightfully brings this action to vindicate CenturyLink's rights against its wayward fiduciaries, and to hold those fiduciaries responsible for the damages they have caused to CenturyLink.

JURISDICTION AND VENUE

13.    The Court has jurisdiction over all claims pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states, and the matter in controversy exceeds $75,000, exclusive of interests or costs.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.    The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in Louisiana or is an individual who has sufficient minimum contacts with Louisiana so as to render the exercise of jurisdiction by the Louisiana courts permissible under traditional notions of fair play and substantial justice.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts business in and maintains executive offices in this District.

16.    In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited

to the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

### A.    Plaintiff

17.    Plaintiff Tim Ault is, and at all relevant times has been, a holder of CenturyLink common stock.  Plaintiff has continuously held CenturyLink stock since July 15, 1999, and is a citizen of Ohio.

### B.    Nominal Defendant

18.    Nominal Defendant CenturyLink is a company incorporated in Louisiana, and the Company's principal executive offices are located at 100 CenturyLink Drive, Monroe, Louisiana 71203.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "CTL."  As of February 16, 2018, the Company had more than 1 billion shares of common stock outstanding.

### C.    Individual Defendants

19.    Defendant Glen F. Post, III ("Post") has been a director of CenturyLink since 1985. Post was Chief Executive Officer ("CEO") of CenturyLink from 1992 to May 23, 2018 and President of CenturyLink from July 1, 2009 to November 2017 (also from 1990 to 2002).  Post served as Chairman of the Board of CenturyLink from June 2002 to June 2009 and as Vice Chairman of the Board of CenturyLink from 1993 and 2002.  Post has also held various other positions at CenturyLink between 1976 and 1993, most notably Treasurer, Chief Financial Officer and Chief Operating Officer.  During the Relevant Period, Post was a member of the Company's Pricing Committee.  Post is a defendant in the Securities Class Action.  Post received $13,131,448 in total compensation from CenturyLink in 2014; $10,664,511 in total compensation from

CenturyLink in 2015; $13,966,214 in total compensation from CenturyLink in 2016; and $14,715,560 in total compensation from CenturyLink in 2017.  Post is a citizen of Louisiana.

20.    Defendant R. Stewart Ewing, Jr. ("Ewing") was the Company's Chief Financial Officer ("CFO") from 1989 to November 2017, Executive Vice President from 1999 to November 2017, and Assistant Secretary from 2009 to November 2017.  Ewing is a defendant in the Securities Class Action.  Ewing received $3,842,520 in total compensation from CenturyLink in 2014; $2,804,629 in total compensation from CenturyLink in 2015; $3,414,376 in total compensation from CenturyLink in 2016; and $6,738,041 in total compensation from CenturyLink in 2017.  During the Relevant Period, while in possession of material, non-public information, Ewing sold at least 65,600 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of approximately $2,601,070.  Ewing is a citizen of Louisiana.

21.    Defendant David D. Cole ("Cole") was the Company's Chief Accounting Officer ("CAO") and Executive Vice President – Controller and Operations Support from May 2013 to March 2018.  Cole is a defendant in the Securities Class Action.  Cole received $2,501,711 in total compensation from CenturyLink in 2014 and $1,829,010 in total compensation from CenturyLink in 2015.  During the Relevant Period, while in possession of material, non-public information, Cole sold at least 37,525 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of approximately $1,298,938.  Cole is a citizen of Louisiana.

22.    Defendant Sunit S. Patel ("Patel") has been the Company's CFO and Executive Vice President since November 2017.  Patel received $4,955,269 in total compensation from CenturyLink in 2017.  Patel is a citizen of Colorado.

23.    Defendant Jeffrey K. Storey ("Storey") is the Company's President and CEO and has been a director of CenturyLink since November 2017.  He was also the Company's Chief

Operating Officer until becoming CEO on May 23, 2018. Prior to CenturyLink's merger with Level 3 in November 2017, he was a director of Level 3. Storey received $10,944,929 in total compensation from CenturyLink in 2017. Storey is a citizen of Oklahoma.

24.     Defendant Martha H. Bejar ("Bejar") has been a director of CenturyLink since January 2016. During the Relevant Period, Bejar was a member of the Company's Audit Committee and the Risk Evaluation Committee. Bejar received $255,804 in total compensation from CenturyLink in 2016, and $313,815 in total compensation from CenturyLink in 2017. Bejar is a citizen of Washington.

25.     Defendant Virginia Boulet ("Boulet") has been a director of CenturyLink since 1995. During the Relevant Period, Boulet was a member of the Company's Human Resources and Compensation Committee and the Chair of the Nominating and Corporate Governance Committee. Boulet received $271,100 in total compensation from CenturyLink in 2014; $276,754 in total compensation from CenturyLink in 2015; $268,804 in total compensation from CenturyLink in 2016; and $296,815 in total compensation from CenturyLink in 2017. During the Relevant Period, while in possession of material, non-public information, Boulet sold at least 6,207 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of approximately $211,634. Boulet is a citizen of Louisiana.

26.     Defendant Peter C. Brown ("Brown") has been a director of CenturyLink since July 2009. During the Relevant Period, Brown was a member of the Company's Audit Committee and Pricing Committee, as well as the Chair of the Risk Evaluation Committee. Brown received $256,100 in total compensation from CenturyLink in 2014; $251,391 in total compensation from CenturyLink in 2015; $255,804 in total compensation from CenturyLink in 2016; and $287,190 in total compensation from CenturyLink in 2017. During the Relevant Period, while in possession

of material, non-public information, Brown sold at least 12,724 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of approximately $389,991. Brown is a citizen of Missouri.

27.     Defendant Kevin P. Chilton ("Chilton") has been a director of CenturyLink since November 2017. Prior to CenturyLink's merger with Level 3 in November 2017, he was a director of Level 3. During the Relevant Period, Chilton was a member of the Company's Audit Committee and the Risk Evaluation Committee. Chilton received $104,649 in total compensation from CenturyLink in 2017. Chilton is a citizen of Colorado.

28.     Defendant Steven T. Clontz ("Clontz") has been a director of CenturyLink since November 2017. Prior to CenturyLink's merger with Level 3 in November 2017, he was a director of Level 3. During the Relevant Period, Clontz was a member of the Company's Nominating and Corporate Governance Committee. Clontz received $95,649 in total compensation from CenturyLink in 2017. Clontz is a citizen of Florida.

29.     Defendant T. Michael Glenn ("Glenn") has been a director of CenturyLink since November 2017. Prior to CenturyLink's merger with Level 3 in November 2017, he was a director of Level 3. During the Relevant Period, Glenn was a member of the Company's Human Resources and Compensation Committee. Glenn received $97,649 in total compensation from CenturyLink in 2017. Glenn is a citizen of Tennessee.

30.     Defendant W. Bruce Hanks ("Hanks") has been a director of CenturyLink since 1992. During the Relevant Period, Brown was the Chair of the Company's Audit Committee, and a member of the Risk Evaluation Committee and the Pricing Committee. Hanks received $295,347 in total compensation from CenturyLink in 2014; $282,905 in total compensation from CenturyLink in 2015; $288,632 in total compensation from CenturyLink

in 2016; and $400,153 in total compensation from CenturyLink in 2017.  Hanks is a citizen of Louisiana.

31.    Defendant Mary L. Landrieu ("Landrieu") has been a director of CenturyLink since November 2015.  During the Relevant Period, Landrieu was a member of the Company's Nominating and Corporate Governance Committee and the Risk Evaluation Committee.  Landrieu received $235,804 in total compensation from CenturyLink in 2016, and $265,815 in total compensation from CenturyLink in 2017.  Landrieu is a citizen of Louisiana.

32.    Defendant Harvey P. Perry ("Perry") has been the Chairman of the Board since May 31, 2017 and has been a director of CenturyLink since 1990.  During the Relevant Period, Perry was a member of the Company's Risk Evaluation Committee.  Perry received $354,263 in total compensation from CenturyLink in 2014; $341,266 in total compensation from CenturyLink in 2015; $347,609 in total compensation from CenturyLink in 2016; and $484,341 in total compensation from CenturyLink in 2017.  During the Relevant Period, while in possession of material, non-public information, Perry sold at least 30,000 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of approximately $945,000.  Perry is a citizen of Louisiana.

33.    Defendant Michael J. Roberts ("Roberts") has been a director of CenturyLink since April 2011.  During the Relevant Period, Roberts was a member of the Company's Nominating and Corporate Governance Committee and the Human Resources and Compensation Committee.  Roberts received $242,100 in total compensation from CenturyLink in 2014; $239,391 in total compensation from CenturyLink in 2015; $241,804 in total compensation from CenturyLink in 2016; and $307,815 in total compensation from CenturyLink in 2017.  Roberts is a citizen of California.

34.     Defendant Laurie A. Siegel ("Siegel") has been a director of CenturyLink since July 2009.  During the Relevant Period, Siegel was the Chair of the Company's Human Resources and Compensation Committee.  Siegel received $262,850 in total compensation from CenturyLink in 2014; $262,696 in total compensation from CenturyLink in 2015; $264,554 in total compensation from CenturyLink in 2016; and $292,565 in total compensation from CenturyLink in 2017.  During the Relevant Period, while in possession of material, non-public information, Siegel sold at least 4,983 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of approximately $134,286.  Siegel is a citizen of New Jersey.

**D.     Party Definitions**

35.     Defendants Post, Ewing, Cole, Patel, Storey, Bejar, Boulet, Brown, Chilton, Clontz, Glenn, Hanks, Landrieu, Perry, Roberts, and Siegel are sometimes referred to herein as the "Individual Defendants."

36.     Defendants Post, Storey, Bejar, Boulet, Brown, Chilton, Clontz, Glenn, Hanks, Landrieu, Perry, Roberts, and Siegel are sometimes referred to herein as the "Director Defendants."

37.     Defendants Bejar, Brown, Chilton, and Hanks are sometimes referred to herein as the "Audit Committee Defendants."

38.     Defendants Ewing, Cole, Boulet, Brown, Perry, and Siegel are sometimes referred to herein as the "Insider Selling Defendants."

**FACTUAL ALLEGATIONS**

39.     CenturyLink is headquartered and incorporated in Louisiana, and provides communications services to residential, business, wholesale, and governmental customers in the United States.  The Company began as a small family-owned telephone company, and grew

through a series of acquisitions, including the acquisition of Embarq Corporation in 2009, and the acquisition of Qwest Communications International, Inc. in 2011.

40.     As of June 2017, the Company offered broadband, Ethernet, colocation, video entertainment, and satellite digital television services to over 5 million subscribers in a 37-state service area and operated through two primary segments: Business and Consumer.

41.     The Company's Consumer segment focused on residential customers, offering products and services including broadband, wireless, and video services (including Prism TV services), as well as legacy services such as local and long-distance telephone lines.  Throughout the Relevant Period, the Company's Consumer segment generated approximately one-third of CenturyLink's revenues.

42.     CenturyLink emphasized "customer-oriented sales, marketing and service" in its sales approach to residential customers.  The Company marketed its products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing, and third parties.  The Company's business strategy relied on "bundling" its products – i.e., providing customers with a comprehensive set of products and services purportedly to "enhance customer loyalty."  CenturyLink's customer service – and the sales force's relationship with customers and compliance with applicable laws and regulations – were critical to the Company's success.

43.     However, the rapid expansion of CenturyLink through acquisitions had created a complicated internal structure, since the Company's computer systems were not fully integrated, leading to multiple sales and billing platforms that were difficult for the Company's employees to access with accuracy.

44.     Without sufficient precautions in place, the Company's sales employees were encouraged to aggressively promote bundled services to customers, often without accurate pricing information, leading to a consistent pattern of promising lower prices than what the customers were actually charged.

45.     When the customers then called to complain about overbilling or charges for unauthorized additional services, the Company's employees would routinely refuse to honor the original price quotes and would deny any errors.  If the customer cancelled the services anyway, additional termination fees or other penalties would then be charged.

**False and Misleading Statements**

46.     During the Relevant Period, the Individual Defendants made and caused the Company to make false and misleading statements concerning the Company's business model, financial prospects, and operational and compliance policies, including a failure to disclose that: (i) CenturyLink's aggressive marketing strategy relied on false information to lure and retain customers; (ii) the Company's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (iii) accordingly, the Company's revenues were the product of illicit conduct and unsustainable; (iv) the foregoing illicit conduct was likely to subject CenturyLink to heightened regulatory scrutiny; (v) CenturyLink had inadequate corporate financial reporting resources, inadequately assessed the risks associated with the Company's financial reporting, and failed to maintain effective internal controls over financial reporting; and (vi) as a result of the foregoing, CenturyLink's public statements were materially false and misleading at all relevant times.

47.     On March 1, 2013, the beginning of the Relevant Period, the Individual Defendants caused CenturyLink to file a Form 10-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2012 (the "2012 10-K").  For the year, the Company reported earnings per share of $1.25 on operating revenue of $18.4 billion, compared to operating revenue of $15.4 billion in the previous year, as well as net income of $777 million, compared to net income of $573 million in the previous year.  With respect to the Company's sales practices, the 2012 10-K stated in relevant part:

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area.  These offices provide sales and customer support services in the community.  We also rely on our call center personnel to promote sales of services that meet the needs of our customers.  ***Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.***

                              *       *       *

***Our approach to our regional markets' residential customers emphasizes customer-oriented sales, marketing and service with a local presence.***  We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties.  We support our distribution with direct mail, bill inserts, newspaper advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Our approach to our regional markets' business and government customers includes a commitment to deliver communications products and services that meet existing and future business needs through bundles of services and integrated service offerings.  Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and government customers.

48.     Further, with respect to regulations and compliance, the 2012 10-K stated, in relevant part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility

- 15 -

commissions, which regulate intrastate communications in our local service area. These agencies issue rules to protect consumers and promote competition; they set the rates that telecommunication companies charge each other for exchanging traffic; and they have established USF to support the provision of services to high-cost areas.  In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region.

*        *        *

### Federal Regulation

We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on non-discriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

49.    In addition, with respect to the Company's ethics standards, the 2012 10-K stated, in relevant part:

We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, including our principal executive officer and senior financial officers, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange.  In the event that we make any changes (other than by a technical, administrative or non-substantive amendment) to, or provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC.  These codes of conduct, as well as copies of our guidelines on significant governance issues and the charters of our audit committee, compensation committee, nominating and corporate governance committee and risk evaluation committee, are also available in the "Corporate Governance" section of our website at *www.centurylink.com/Pages/AboutUs/Governance/* or in print to any shareholder who requests them by sending a written request to our Corporate Secretary at CenturyLink, Inc., 100 CenturyLink Drive, Monroe, Louisiana, 71203.

50.    The 2012 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The 2012 10-K was also signed by Defendants Post, Ewing, Cole, Boulet, Brown, Hanks, Perry, Roberts, and Siegel.

- 16 -

51.     On February 27, 2014, the Individual Defendants caused CenturyLink to file a Form 10-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2013 (the "2013 10-K").  For the year, the Company reported operating revenue of $18.1 billion, compared to operating revenue of $18.4 billion in the previous year, as well as net loss of $239 million, the same as net income of $777 million in the previous year.  With respect to the Company's sales practices, the 2013 10-K stated in relevant part:

### Products and Services

Our products and services include local and long-distance, broadband, private line (including special access, which we market to wholesale and business customers), MLPS, data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video services and other ancillary services.

***We offer our customers the ability to bundle together several products and services.***  For example, we offer integrated and unlimited local and long-distance services.  Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services.  ***We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.***

*            *            *

### Sales and Marketing

We maintain local offices in most of the larger population centers within our local service area.  These offices provide sales and customer support services in the community.  We also rely on our call center personnel to promote sales of services that meet the needs of our customers.  ***Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.***

*            *            *

Our approach to our business and governmental customers includes a commitment to deliver communications and network products and services that meet existing and future business needs through ***bundles of services and integrated service offerings***.  Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives,

- 17 -

inbound call centers, telemarketing and third parties.  We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, telemarketing and third parties.

Our approach to our wholesale customers includes a commitment to deliver communications solutions that meet existing and future needs of national network telecommunications providers through bandwidth growth and quality of services.

Our data hosting operations utilize a solution-based selling approach.  By working directly with potential and existing clients, we are able to understand our clients' IT infrastructure and long-term goals.  We also market through indirect channels, including collaborations with existing clients and technology providers, telecommunications companies and system integrators.

52.    With respect to regulations and compliance, and to ethics standards, the 2013 10-K included similar statements to those contained in the 2012 10-K as stated above.

53.    The 2013 10-K contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The 2013 10-K was also signed by Defendants Post, Ewing, Cole, Boulet, Brown, Hanks, Perry, Roberts, and Siegel.

54.    On May 7, 2014, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2014 ("Q1 2014").  For the quarter, CenturyLink reported net income of $203 million, or $0.35 per diluted share, on revenue of $4.54 billion, compared to net income of $298 million, or $0.48 per diluted share, on revenue of $4.51 billion for the same period in the prior year.  Commenting on these results, Defendant Post stated: "Cash flows for the quarter were also strong primarily due to our revenue outperformance and disciplined cost containment by our employees.  We continue to see increasing demand from business customers for our reliable, secure solutions that meet their network and hosting needs."

55.     On May 9, 2014, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q1 2014 10-Q"), confirming the results in the press release.  The Q1 2014 10-Q stated, in relevant part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers.  Our communications services include local and long-distance, broadband, private line (including special access), Multiprotocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video and other ancillary services.

> *        *        *

> *We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services*.

56.     The Q1 2014 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

57.     On August 6, 2014, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended June 30, 2014 ("Q2 2014").  For the quarter, CenturyLink reported net income of $193 million, or $0.34 per diluted share, on revenue of $4.54 billion, compared to net income of $269 million, or $0.44 per diluted share, on revenue of $4.53 billion for the same period in the prior year.  Commenting on these results, Defendant Post stated:

> Cash flows for the quarter were also strong, primarily due to solid revenue performance and continued focus by our employees on containing costs.

> *        *        *

> We had a strong funnel of sales opportunities entering the third quarter and we are looking forward to continuing to execute on our strategic priorities to create value for shareholders.

58.     On August 7, 2014, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q2 2014 10-Q"), confirming the results in the press release.  The Q2 2014 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

59.     On November 5, 2014, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended September 30, 2014 ("Q3 2014").  For the quarter, CenturyLink reported net income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion, compared to net loss of $1.05 billion, or $1.76 per diluted share, on revenue of $4.52 billion for the same period in the prior year.  Commenting on these results, Defendant Post stated:

> We expect the expansion of our symmetrical 1 gigabit service to 16 cities that we announced in August to create additional opportunities to drive strategic revenue growth from businesses and consumers in the months ahead.  Also, we have recently integrated and aligned our sales and service delivery models to improve the consistency and effectiveness of our go-to-market strategies as we remain focused on driving increased sales and operating efficiencies in our business.

60.     On November 6, 2014, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q3 2014 10-Q"), confirming the results in the press release.  The Q3 2014 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.     On February 24, 2015, the Individual Defendants caused CenturyLink to file a Form 10-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2014 (the "2014 10-K").  For the year, the Company reported operating revenue of $18.0 billion, compared to operating revenue of $18.1 billion in the previous

year, as well as net income of $772 million, compared with net loss of $239 million in the previous

year.  With respect to the Company's sales practices, the 2014 10-K stated in relevant part:

> ### Products and Services
>
> Our products and services include local and long-distance, broadband, private line
> (including special access), MPLS, data integration, managed hosting (including
> cloud hosting), colocation, Ethernet, network access, video, wireless and other
> ancillary services.
>
> **We offer our customers the ability to bundle together several products and
> services.**  For example, we offer integrated and unlimited local and long-distance
> services.  Our customers can also bundle two or more services such as broadband,
> video (including DIRECTV through our strategic partnership), voice and Verizon
> Wireless (through our strategic partnership) services.  **We believe our customers
> value the convenience and price discounts associated with receiving multiple
> services through a single company.**
>
> \*        \*        \*
>
> ### Sales and Marketing
>
> We maintain local offices in most of the larger population centers within our local
> service area.  These offices provide sales and customer support services in the
> community.  We also rely on our call center personnel to promote sales of services
> that meet the needs of our customers**.  Our strategy is to enhance our sales by
> offering a comprehensive bundle of services and deploying new technologies to
> further enhance customer loyalty.**

62.    With respect to regulations and compliance, and to ethics standards, the 2014 10-K

included similar statements to those contained in the 2012 10-K as stated above.

63.    The 2014 10-K contained signed SOX certifications by Defendants Post and Ewing,

certifying that the financial information contained in the filing was accurate and disclosed any

material changes to the Company's internal control over financial reporting.  The 2014 10-K was

also signed by Defendants Post, Ewing, Cole, Boulet, Brown, Hanks, Perry, Roberts, and Siegel.

64.    On May 5, 2015, the Individual Defendants caused CenturyLink to issue a press

release and file a current report on Form 8-K with the SEC reporting its financial results for the

quarter ended March 31, 2015 ("Q1 2015").  For the quarter, CenturyLink reported net income

of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion, compared to net income of $203 million, or $0.35 per diluted share, on revenue of $4.54 billion for the same period in the prior year.  Commenting on these results, Defendant Post stated:

> We are beginning to see the benefits of the organizational realignment implemented in late 2014, and we are confident our new streamlined operating structure positions us to drive stronger sales results, strategic revenue growth and operating efficiency. We continue to see strong demand from business customers for high-bandwidth data services and our integrated network and IT managed services solutions.

65.    On May 6, 2015, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q1 2015 10-Q"), confirming the results in the press release.  The Q1 2015 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

66.    On August 5, 2015, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended June 30, 2015 ("Q2 2015").  For the quarter, CenturyLink reported net income of $143 million, or $0.26 per diluted share, on revenue of $4.42 billion, compared to net income of $193 million, or $0.34 per diluted share, on revenue of $4.54 billion for the same period in the prior year.  Commenting on these results, Defendant Post stated:

> The sales force realignment that we completed earlier this year is gaining traction and beginning to positively impact our results. For example, the improvement in sales to business customers that began in March continued throughout the quarter, resulting in 15% sequential growth in Business sales compared to first quarter sales. In addition, we exited the second quarter with a strong funnel of sales opportunities, which has continued to grow.  While our path to revenue and cash flow growth is taking longer than we initially anticipated, we remain confident that we have the right assets and strategies to drive long-term revenue growth.

67.    On August 6, 2015, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q2 2015 10-Q"), confirming the results in the

press release.  The Q2 2015 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

68.    On November 4, 2015, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended September 30, 2015 ("Q3 2015").  For the quarter, CenturyLink reported net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion, compared to net income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion for the same period in the prior year.  Commenting on these results, Defendant Post stated:

> We exited the quarter with a very strong business sales funnel, including an increased number of large deal opportunities.  This funnel has continued to strengthen during the fourth quarter and October sales results were the highest of the year.

69.    On November 5, 2015, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q3 2015 10-Q"), confirming the results in the press release.  The Q3 2015 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

70.    On February 25, 2016, the Individual Defendants caused CenturyLink to file a Form 10-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2015 (the "2015 10-K").  For the year, the Company reported operating revenue of $17.9 billion, compared to operating revenue of $18.0 billion in the previous year, as well as net income of $878 million, compared with net income of $772 million in the previous year.  With respect to the Company's sales practices, the 2014 10-K stated in relevant part:

***Products and Services***

Our products and services include local and long-distance voice, high-speed Internet, MPLS, private line (including special access), data integration, Ethernet, colocation, managed hosting (including cloud hosting), network, public access, video, wireless and other ancillary services.

***We offer our customers the ability to bundle together several products and services.*** For example, we offer integrated and unlimited local and long-distance voice services. Our customers can also bundle two or more services such as high-speed Internet, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. ***We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.***

\*       \*       \*

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers. ***Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands. Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.***

\*       \*       \*

Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

71.     With respect to regulations and compliance, and to ethics standards, the 2015 10-K included similar statements to those contained in the 2012 10-K as stated above.

72.     The 2015 10-K contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any

material changes to the Company's internal control over financial reporting. The 2015 10-K was also signed by Defendants Post, Ewing, Cole, Bejar, Boulet, Brown, Hanks, Landrieu, Perry, Roberts, and Siegel.

73.     On May 4, 2016, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2016 ("Q1 2016"). For the quarter, CenturyLink reported net income of $236 million, or $0.44 per diluted share, on revenue of $4.4 billion, compared to net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> CenturyLink achieved another solid quarter, with core revenues, operating cash flow and adjusted diluted earnings per share in-line with our previous guidance.

> *        *        *

> We remain on track with our data centers and colocation business strategic alternatives process and are pleased with the level of interest and progress to date. We continue to focus on leveraging our strategic asset portfolio and financial strength to execute on our operational initiatives and better serve our customers.

74.     On May 5, 2016, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q1 2016 10-Q"), confirming the results in the press release. The Q1 2016 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

75.     On August 3, 2016, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended June 30, 2016 ("Q2 2016"). For the quarter, CenturyLink reported net income of $196 million, or $0.36 per diluted share, on revenue of $4.4 billion, compared to net income of

$143 million, or $0.26 per diluted share, on revenue of $4.42 billion for the same period in the prior year.  Commenting on these results, Defendant Post stated:

> ***Our new sales and marketing leadership team continues to refine our sales channels and associated go-to-market strategies for the Business market, and continues to pivot toward higher-value bundled solutions for the Consumer market.***  While second quarter Consumer subscriber metrics were softer than anticipated, we expect to see an improvement in unit trends in the second half of the year.

76.     On August 4, 2016, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q2 2016 10-Q"), confirming the results in the press release.  The Q2 2016 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

77.     On October 31, 2016, CenturyLink entered into an agreement and plan of merger to acquire Level 3, in a cash and stock transaction valued at approximately $34 billion, including the assumption of debt.  The combined company is the second largest domestic communications provider, and serves global enterprise customers in more than 60 countries.

78.     Also on October 31, 2016, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended September 30, 2016 ("Q3 2016").  For the quarter, CenturyLink reported net income of $152 million, or $0.28 per diluted share, on revenue of $4.38 billion, compared to net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion for the same period in the prior year.

79.     On November 4, 2016, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q3 2016 10-Q"), confirming the results in the press release.  The Q3 2016 10-Q contained signed SOX certifications by Defendants Post and

Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

80.     On February 23, 2017, the Individual Defendants caused CenturyLink to file a Form 10-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2016 (the "2016 10-K"). For the year, the Company reported operating revenue of $17.5 billion, compared to operating revenue of $17.9 billion in the previous year, as well as net income of $626 million, compared with net income of $878 million in the previous year. With respect to the Company's sales practices, the 2014 10-K stated in relevant part:

### Products and Services

From time to time, we change the categorization of our products and services, and we may make similar changes in the future. During the second quarter of 2016, we determined that because of declines due to customer migration to other strategic products and services, certain of our business low-bandwidth data services, specifically our private line (including special access) services in our business segment, are more closely aligned with our legacy services than with our strategic services. As described in greater detail in Note 14—Segment Information, these operating revenues are now reflected as legacy services.

Our products and services include local and long-distance voice, broadband, MPLS, private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, VoIP, information technology and other ancillary services.

***We offer our customers the ability to bundle together several products and services.*** For example, we offer integrated and unlimited local and long-distance voice services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. ***We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.***

\*     \*     \*

- 27 -

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers. ***Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands. Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.***

\*        \*        \*

Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

81.    With respect to regulations and compliance, and to ethics standards, the 2016 10-K included similar statements to those contained in the 2012 10-K as stated above.

82.    The 2016 10-K contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 2016 10-K was also signed by Defendants Post, Ewing, Cole, Bejar, Boulet, Brown, Hanks, Landrieu, Perry, Roberts, and Siegel.

83.    On May 3, 2017, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2017 ("Q1 2017"). For the quarter, CenturyLink reported net income of $163 million, or $0.30 per diluted share, on revenue of $4.21 billion, compared to net income

of $236 million, or $0.44 per diluted share, on revenue of $4.4 billion for the same period in the

prior year.  Commenting on these results, Defendant Post stated:

> CenturyLink's first quarter high-bandwidth data services revenues for Enterprise
> customers grew by 2% sequentially and 4% year-over-year, driven by increasing
> demand for higher-speed Enterprise data services as businesses continue their
> digital transformation. . . .This increasing demand further validates the rationale for
> our pending acquisition of Level 3 Communications, which will transform
> CenturyLink into the second largest domestic communications provider serving
> global enterprise customers.
>
> We continue to make good progress in obtaining the necessary approvals for the
> pending Level 3 acquisition and integration planning for the combination is on
> track.  We are very pleased with the extremely talented and experienced senior
> leadership team for the combined company, announced last week, which will be
> effective at closing.  We continue to expect to complete the transaction by the end
> of September 2017.

84.     On May 5, 2017, the Individual Defendants caused CenturyLink to file a quarterly

report on Form 10-Q with the SEC (the "Q1 2017 10-Q"), confirming the results in the press

release.  The Q1 2017 10-Q contained signed SOX certifications by Defendants Post and Ewing,

certifying that the financial information contained in the filing was accurate and disclosed any

material changes to the Company's internal control over financial reporting.

85.     On June 1, 2017, the Individual Defendants caused CenturyLink to issue a press

release and file a current report on Form 8-K with the SEC announcing the Company's CEO

succession plan.  The press release stated, in relevant part:

> **MONROE, La. –** CenturyLink, Inc. (NYSE: CTL) today announced that upon
> closing of the CenturyLink – Level 3 acquisition, Jeff Storey, currently president
> and CEO of Level 3 Communications, Inc. (NYSE: LVLT), will join CenturyLink
> as its president and chief operating officer.  As previously announced, after the
> closing Glen F. Post III will remain CEO of CenturyLink. It is expected that Storey
> will succeed Post as CEO of CenturyLink effective Jan. 1, 2019 and that Post will
> then become executive chairman of the company's board of directors.
>
> The two companies continue to expect to close the transaction by Sept. 30, 2017.
>
> "Throughout our company's evolution, we have focused on investment, growth and
> value creation.  I am pleased that our collective work has put us at the forefront of

the digital world.  As we move into this next phase of our growth, I am confident in the strength of our position, the scope of our opportunity and Jeff's ability to lead our company forward – first as president and COO and then as CEO," Post said. "Transitions like this are bittersweet, but I am confident this is the right time to begin to take this next step into our future.  At CenturyLink, I have had the privilege of working with some of the most talented people in our industry.  Their leadership, dedication, loyalty and tireless efforts have been – and will continue to be – the key to our success.  I look forward to joining forces with Jeff and the talented employees from Level 3 as we pursue the exciting opportunities that lie ahead."

"Jeff has been an excellent leader for Level 3 and shares our excitement about the future of our business and the importance of world-class customer experience to our success," Post said.  "Just as important, Jeff shares my focus on continuing to invest in our network, products and services to meet our customers' needs.  I look forward to continuing to work closely with Jeff to shape the future of the combined company."

"Glen has done an exceptional job leading CenturyLink over the last 25 years, steadily transforming the company to become a leading international communications provider," Storey said.  "I strongly believe in the combination of the two companies and I am very excited to become part of the CenturyLink management team after the transaction closes.  I look forward to continuing to work with Glen to drive a successful integration, an outstanding customer experience and growth in shareholder value.  The opportunities ahead of us are exciting and I am committed to building on this impressive foundation."

*      *      *

CenturyLink also announced that Harvey P. Perry, vice chairman of the board of CenturyLink, has been appointed chairman of the board, effective immediately.  He replaces William A. Owens, who retired from the board on May 24, 2017. W. Bruce Hanks, a member of the CenturyLink board of directors, has been named vice chairman, also effective immediately.  As previously announced, Storey is one of four Level 3 board members who will join the CenturyLink board at closing.

86.     On June 14, 2017, the Company's stock closed at $27.31 per share.

## THE REASONS THE STATEMENTS WERE FALSE

87.     The true facts, which were known or recklessly disregarded by the Individual Defendants but were concealed from the investing public, were as follows:

(a)     CenturyLink's aggressive marketing strategy relied on false information to lure and

          retain customers;

(b)     the Company's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers;

(c)     accordingly, the Company's revenues were the product of illicit conduct and unsustainable;

(d)     the foregoing illicit conduct was likely to subject CenturyLink to heightened regulatory scrutiny;

(e)     CenturyLink had inadequate corporate financial reporting resources, inadequately assessed the risks associated with the Company's financial reporting, and failed to maintain effective internal controls over financial reporting; and

(f)     as a result of the foregoing, the Company's public statements including statements regarding CenturyLink's financial and business prospects were materially false and misleading at all relevant times.

88.     As a result of the Individual Defendants' false and misleading statements and omissions, CenturyLink shares traded at artificially inflated prices during the Relevant Period. Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, investors sold CenturyLink stock, causing the Company's stock price to drop $1.23 per share, to close at $25.72 per share on June 16, 2017, a one-day decline of nearly 5%, erasing over $1.3 billion dollars in market capitalization.

## THE TRUTH BEGINS TO EMERGE

89.     On June 14, 2017, a former CenturyLink sales representative, named Heidi Heiser, filed a whistleblower complaint in Arizona state court, *Heiser v. CenturyLink, Inc.*, Case No. CV2017-008928 (Maricopa Cty. Super. Ct.) (the "Heiser Complaint").   In the Heiser

Complaint, Ms. Heiser alleged that her employment with the Company was terminated after she reported unlawful billing practices that she had observed and refused to take part in.

90.    On June 16, 2017, *Bloomberg* published an article entitled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme," which included details from the Heiser Complaint, and revealed the pattern of unlawful billing practices to the Company's shareholders. The *Bloomberg* article reported, in relevant part:

> A former CenturyLink Inc. employee claims she was fired for blowing the whistle on the telecommunications company's high-pressure sales culture that left **customers paying millions of dollars for accounts they didn't request**, according to a lawsuit filed this week in Arizona state superior court.
>
> *                *                *
>
> The plaintiff, Heidi Heiser, worked from her home for CenturyLink as a customer service and sales agent from August 2015 to October 2016. The suit claims she was fired days after notifying Chief Executive Officer Glen Post of the alleged scheme during a companywide question-and-answer session held on an internal message board.
>
> The complaint alleges **CenturyLink "allowed persons who had a personal incentive to add services or lines to customer accounts to falsely indicate on the CenturyLink system the approval by a customer of new lines or services." This would sometimes result in charges that hadn't been authorized by customers**, according to the complaint.
>
> *                *                *
>
> Heiser's complaint alleges that she became increasingly concerned about what she observed at CenturyLink after news of Wells Fargo & Co.'s regulatory troubles broke in September. In that case, Wells Fargo employees opened deposit and credit card accounts without customers' consent to earn incentives and meet sales goals. Without admitting wrongdoing, Wells Fargo ended up firing more than 5,000 employees and agreeing to pay $185 million in fines, in addition to compensating customers for fees related to the unauthorized accounts.
>
> **The complaint likens what Heiser said CenturyLink sales agents did to the Wells Fargo scandal and estimated the alleged unauthorized fees amounted to "many millions" of dollars.** She says her concerns were bolstered by posts she had read on review websites.

- 32 -

A review of Yelp and Pissed Consumer finds evidence of irate customers. "They signed me up unauthorized," wrote Sierrah U. of Bend, Ore., on Yelp in February 2015. "I was talking to someone interested in signing up two weeks ago after realizing my modem was incapable I told the guy I didn't want to sign up and I would call back later if I was still interested, he got really upset hung up on me. Two weeks later I receive a bill! With a ton a fees, I don't even have internet with them!"

**When a customer complained about an unauthorized charge, customer service and sales agents like Heiser were directed "to inform the complaining customer that CenturyLink's system indicated the customer had approved the service,"** according to the complaint, and as a result "it was really the customer's word against CenturyLink."

"CenturyLink is going to be in a world of hurt if this turns out to be true," said Roger Entner, an analyst with Recon Analytics.

**Initially, Heiser told her direct superiors about her suspicions and was told in response to her complaints to "stay positive and not to mention her concerns again,"** according to the complaint. Heiser didn't report her concerns to the Federal Communications Commission or the Occupational Safety and Health Administration, a division of the U.S. Department of Labor.

*      *      *

"When sales targets are unrealistic and employees' livelihoods are at stake, some people are going to take shortcuts," said Entner, the telecom analyst. "Companies have the responsibility to make sure the goals are realistic. You don't want to drive people to break the law."

91.     In response to these shocking revelations, the price of CenturyLink shares dropped $1.23 per share, to close at $25.72 per share on June 16, 2017, a one-day decline of nearly 5%, on volume of 43 million shares.

92.     On June 19, 2017, *Bloomberg* reported that another complaint had been filed against CenturyLink: "a class action seeking damages as high as $12 billion." According to the article:

The new lawsuit, filed in the central district of California late Sunday night, cites Heiser's suit, as well as similar accusations posted on social media and consumer review websites by people identifying themselves as CenturyLink customers, and accuses CenturyLink of fraud, unfair competition, and unjust enrichment.

"Ms. Heiser's allegations of what she observed, and what CenturyLink corporate culture encouraged, are consistent with the experiences of hundreds of thousands and potentially millions of consumers who have been defrauded by CenturyLink," the complaint states. "It is estimated that the damages to consumers could range between $600 million and $12 billion, based on CenturyLink's 5.9 million subscribers."

93.     Following these additional revelations, CenturyLink's share price declined another $0.36 per share to close at $25.36 per share.

94.     On June 26, 2017, an analyst from Barclay's Capital Inc. published a report entitled "The Roz Report: A Risk Framework for Recent CenturyLink Allegations." The report cited allegations of fraudulent business practices by the Company and noted "we expect [the allegations] to serve as a lingering overhang on the shares . . . ."

95.     On July 13, 2017, the *StarTribune* reported that Minnesota's attorney general, Lori Swanson, had filed a lawsuit alleging that CenturyLink had improperly billed its customers. According to the article:

Minnesota Attorney General Lori Swanson sued CenturyLink on Wednesday as she alleged that the internet, phone and cable television provider frequently billed Minnesota customers at higher rates than its sales agents quoted.

Flanked by Minnesotans who have filed some of the "hundreds" of complaints about charges they say they didn't agree to, Swanson said she's asking a judge to impose civil penalties, order the company to change its sales practices and require that CenturyLink pay restitution to customers who were misled about their purchases.

"I want [CenturyLink] to knock it off," Swanson said. "It is not OK for a company to quote one price and then charge another for something as basic as cable television and internet service. We want an injunction so the company stops doing this to other people, and hopefully fixes the problem for these people as well."

The lawsuit, filed in Anoka County District Court, accuses Louisiana-based CenturyLink of committing consumer fraud and engaging in deceptive trade practices. It cites 37 specific cases in which people were overbilled by the company and denied the opportunity to reduce those charges — even when they had the original offer in writing.

96.     Details continued to emerge of the Company's pattern of improper sales practices, resulting in a deluge of additional lawsuits.  Class action suits against CenturyLink on behalf of the Company's customers were filed in numerous states including Alabama, Arizona, California, Colorado, Idaho, Nevada, Oregon, and Washington.

97.     On October 23, 2017, CenturyLink entered into a stipulated order with the Minnesota Attorney General.  Among other things, the Company agreed to:

   a.  Not make any false statement of material fact or omit any material fact in connection with the sale of internet and/or television services to Minnesota consumers; and

   b.  Provide, at the time of sale:
       i.    The monthly base price of the services purchased;
       ii.   The amount of each monthly recurring fee in addition to the monthly base price;
       iii.  The amount of monthly access recovery charges;
       iv.   All one-time fees charged to the initial bill;
       v.    The amount of the first invoice;
       vi.   Recurring total costs;
       vii.  Total duration of the agreement; and
       viii. Any restrictions or conditions on a consumer's ability to receive the quoted price.

98.     On November 1, 2017, CenturyLink completed its acquisition of Level 3.  In connection with the acquisition, CenturyLink issued a press release and filed a current report on Form 8-K with the SEC stating, in relevant part:

   Management Transitions.  In accordance with our previously-announced succession plan, Glen F. Post, III stepped down from the role of President of CenturyLink effective upon completion of the Initial Merger (such time, the "Closing").  Mr. Post continues to serve as our Chief Executive Officer and a director.

   Jeffrey K. Storey, age 57, was appointed to serve as President and Chief Operating Officer of CenturyLink (and, as noted below, one of our directors) effective upon the Closing.  As previously announced, we currently anticipate that Mr. Storey would succeed Mr. Post as our Chief Executive Officer on January 1, 2019, at which time Mr. Post would become executive chairman of our board of directors.

*     *     *

- 35 -

<u>Appointment of New Directors</u>.  Effective upon the Closing, we expanded the size of our Board of Directors from 9 to 13 members.  At such time, pursuant to the Merger Agreement, our Board appointed the individuals set forth below (each of whom served as a director of Level 3 prior to the Closing) to the Board and to the respective committees thereof specified below:

| Name | Committee (s) |
| --- | --- |
| Kevin P. Chilton | Audit; Risk Evaluation |
| Steven T. Clontz | Nominating and Governance |
| T. Michael Glenn | Human Resources and Compensation |
| Jeffrey K. Storey | — |

\*       \*       \*

<u>Retirement of Certain Officers of CenturyLink</u>.  Effective at the Closing, R. Stewart Ewing, Jr., who previously served as our Executive Vice President and Chief Financial Officer, and Dean J. Douglas, who previously served as President – Enterprise Markets, each stepped down from all executive positions with CenturyLink and its subsidiaries.  Mr. Ewing's retirement will be effective after a short transition period, and Mr. Douglas' retirement was effective immediately.

In connection with Mr. Ewing's retirement, our Human Resources and Compensation Committee approved a discretionary increase in the amount of cash severance due to him under our Executive Severance Plan, from 52 weeks of pay to 104 weeks of pay, resulting in an additional $1,399,158 due to him.  In addition, the Committee awarded Mr. Ewing a special discretionary cash bonus of $1,000,000 based on its assessment of his performance related to merger integration activities over the past year.  The Committee also approved certain changes to his outstanding equity awards.  Specifically, the Committee accelerated vesting of all 46,157 of Mr. Ewing's outstanding shares of time-based restricted stock effective at Closing.  With respect to his 97,304 outstanding shares of performance-based restricted stock, Mr. Ewing will continue to hold those awards subject to their original performance conditions.  In connection with approving this supplemental compensation, the Committee considered a range of factors, including Mr. Ewing's contributions to the growth of CenturyLink over the past 34 years and the critical role he played in connection with negotiating, financing and implementing the Acquisition.

99.    On December 7, 2017, CenturyLink issued a press release and filed a current report on Form 8-K with the SEC announcing the conclusions and key findings of the special committee of independent board members.  The press release stated, in relevant part:

**MONROE, La. – Dec. 7, 2017** – <u>CenturyLink, Inc.</u> (the "Company") today announced that a Special Committee of independent board members has reported the findings of its previously announced review of the Company's policies,

procedures and practices relating to consumer sales, service and billing. The Company's outside directors promptly and voluntarily formed the Special Committee after a former employee alleged that the Company engaged in sales-related misconduct, including charging customers for services they did not order—a practice known as "cramming." Over the past six months, the Special Committee, together with independent counsel from O'Melveny & Myers LLP and forensic data analysts, collected and searched more than 9.7 million documents as well as 4.3 terabytes of billing data consisting of over 32 billion billing records; they also interviewed more than 200 current and former Company employees.

The Company's management cooperated fully with the Special Committee during this review.

The Special Committee's key findings:

- The investigation did not reveal evidence to conclude that any member of the Company's management team engaged in fraud or wrongdoing.

- Company management did not condone or encourage cramming, and the evidence did not show that cramming was common at the Company. The Company maintains specific policies and procedures that prohibit and are designed to prevent and deter cramming. When instances of cramming were found to have occurred, the Company took reasonable actions to discipline employees. However, the Company's investment in consumer sales monitoring was not sufficiently effective in proactively detecting and quantifying potential cramming.

- Some of the Company's products, pricing and promotions were complex and caused confusion, and the resulting bills sometimes failed to meet customer expectations. Additionally, limitations in the Company's ordering and billing software made it difficult to provide customers with estimates of their bills and confirmation of service letters that reflected all discounts, prorated charges, taxes and fees.

- Systems and human errors led to certain customers not receiving an offered point-of-sale discount. The Company did not fully address this issue in a timely manner for some customers.

In commenting on the Special Committee's investigation, CenturyLink CEO Glen Post stated, "The Company accepts the Special Committee's findings and conclusions. The investigation confirmed my long-held belief that there was no fraud or wrongdoing at the Company and that cramming was neither widespread nor condoned. However, we know there have been times when we haven't provided our customers the experience they deserve. We have identified a number of areas where we can improve the customer experience and have already made significant progress in addressing those areas."

Mr. Post concluded, "We remain committed to maintaining an ethical business culture based on our Unifying Principles—fairness, honesty and integrity, commitment to excellence, positive attitude, respect, faith and perseverance. Those principles are at the core of who we are as a company and we want our customers to feel that in every interaction with us."

100. On February 15, 2018, a consolidated class action complaint was filed in the Consolidated Action, including detailed allegations based on facts provided by thousands of customers, regarding CenturyLink's aggressive sales practices that encouraged and rewarded deceptive and unlawful conduct.

101. On March 6, 2018, CenturyLink issued a press release announcing that the Company's CEO, Defendant Post, would be retiring in May, effective the date of the Company's annual meeting, and that Defendant Storey will assume the role as CEO on that date. Previously, Defendant Post had stated that he would remain as CEO until January 1, 2019. In connection with Post's retirement, he stands to receive, upon retirement, (1) vesting of half of his 2018 time-vested restricted shares; (2) retention of half of his 2018 performance-based restricted shares subject to their original performance conditions; (3) vesting of the equity portion of his 2017 special integration award at a 100% payout rate; and (4) full vesting of all time-vested restricted shares granted to him before 2018 and to retain, subject to their original performance conditions, all performance-based restricted shares granted to him before 2018.

102. In the same press release, the Company announced that Defendant Perry will remain in his role as Chairman of the Board.

### INSIDER SELLING

103. During the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants took advantage of the artificially-inflated prices to sell their CenturyLink shares for substantial proceeds. Specifically, as detailed below, the

Insider Selling Defendants collectively sold *more than $5.6 million* of personally-held CenturyLink common stock.

104.    Defendant Ewing was the Company's CFO during the Relevant Period. Ewing was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Ewing sold at least 65,600 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of *more than $2.6 million*. Ewing's sales were timed to maximize profits from the Company's then artificially inflated stock price.

105.    Defendant Cole was the Company's CAO and Controller during the Relevant Period. Cole was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Cole sold at least 37,525 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of *more than $1.29 million*. Cole's sales were timed to maximize profits from the Company's then artificially-inflated stock price.

106.    Defendant Boulet was a member of the Company's Board during the Relevant Period. Boulet was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Boulet sold at least 6,207 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of approximately $211,634. Boulet's sales were timed to maximize profits from the Company's then artificially-inflated stock price.

107.    Defendant Brown was a member of the Company's Board during the Relevant Period. Brown was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in

possession of this information, Brown sold at least 12,724 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of approximately $389,991. Brown's sales were timed to maximize profits from the Company's then artificially-inflated stock price.

108.    Defendant Perry was the Chairman of the Board during the Relevant Period. Perry was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Perry sold at least 30,000 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of *approximately $945,000*. Perry's sales were timed to maximize profits from the Company's then artificially-inflated stock price.

109.    Defendant Siegel was a member of the Company's Board during the Relevant Period. Siegel was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Siegel sold at least 4,983 personally-held shares of CenturyLink stock at artificially-inflated prices for proceeds of approximately $134,285. Siegel's sales were timed to maximize profits from the Company's then artificially-inflated stock price

110.    These insider sales were executed under highly suspicious circumstances and occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein. The Insider Selling Defendants' sales during the Relevant Period include the following:

| | | | | | |
|---|---|---|---|---|---|
| EWING, JR. | CFO | 11/13/2014 | 5000 | $40.3835 | $201,917.50 |
| | | 11/12/2014 | 40000 | $41.0533 | $1,642,132.00 |
| | | 5/12/2014 | 600 | $36.7901 | $22,074.06 |
| | | 5/12/2014 | 20000 | $36.7473 | $734,946.00 |
| | | **TOTAL** | **65,600** | **TOTAL** | **$2,601,069.56** |
| | | | | | |
| COLE | CAO | 10/27/2016 | 30000 | $33.0000 | $990,000.00 |
| | | 12/2/2014 | 7525 | $41.0549 | $308,938.12 |
| | | **TOTAL** | **37,525** | **TOTAL** | **$1,298,938.12** |
| | | | | | |
| BOULET | DIRECTOR | 3/6/2014 | 3200 | $31.3014 | $100,164.48 |
| | | 5/28/2013 | 3007 | $37.0700 | $111,469.49 |
| | | **TOTAL** | **6,207** | **TOTAL** | **$211,633.97** |
| | | | | | |
| BROWN | DIRECTOR | 2/29/2016 | 12724 | $30.6500 | $389,990.60 |
| | | **TOTAL** | **12,724** | **TOTAL** | **$389,990.60** |
| | | | | | |
| PERRY | CHAIRMAN | 10/27/2016 | 5000 | $32.0000 | $160,000.00 |
| | | 10/27/2016 | 5000 | $33.0000 | $165,000.00 |
| | | 7/13/2016 | 20000 | $31.0000 | $620,000.00 |
| | | **TOTAL** | **30,000** | **TOTAL** | **$945,000.00** |
| | | | | | |
| SIEGEL | DIRECTOR | 12/9/2015 | 603 | $26.9400 | $16,244.82 |
| | | 12/9/2015 | 4380 | $26.9500 | $118,041.00 |
| | | **TOTAL** | **4,983** | **TOTAL** | **$134,285.82** |
| | | | | | |
| | | **GRAND TOTAL** | **157,039** | **GRAND TOTAL** | **$5,580,918.07** |

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

111.    By reason of their positions as officers, directors, and/or fiduciaries of CenturyLink, and because of their ability to control the business and corporate affairs of CenturyLink, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CenturyLink in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of CenturyLink and its

shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

112.    Each director and officer of the Company owes to CenturyLink and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

113.    In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

114.    In addition to these duties, the members of the Audit Committee owed specific duties to CenturyLink under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

115.    Specifically, according to CenturyLink's Audit Committee Charter, the Audit Committee's responsibilities include the primary function of assisting the Board in fulfilling its oversight duties by:

- overseeing the Company's system of financial reporting, auditing, controls and legal compliance;

- monitoring the operation of such system and the integrity of the Company's financial statements and related disclosures;

- monitoring the qualifications, independence and performance of the outside and internal auditors, and

- overseeing the Company's finance functions.

116.   Specifically, regarding review of financial reporting, the members of the Audit Committee owed specific duties to the Company under the Audit Committee Charter to:

- review and discuss with management and the outside auditors the Company's quarterly financial statements and MD&A disclosures prior to their public release;

- discuss with management the Company's financial information and earnings guidance provided to analysts and rating agencies;

- review with management and the outside auditors the Company's financial information, including (a) any report, opinion or review rendered on the financial statements by management or the outside auditors (including under SAS No. 61 or 71) and (b) any analysis prepared by management or the outside auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements;

- review and discuss reports from the outside auditors on:

   o   the Company's critical accounting policies;

   o   all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative treatments, and the treatment preferred by the outside auditors; and

   o   other material written communications between the outside auditors and management, such as any management letter or schedule of unadjusted differences;

- review and discuss reports from the outside auditors on:

   o   conditions or matters, if any, that must be reported under generally accepted auditing standards (including SAS No. 61), including: (i) difficulties or disputes with management or the internal auditors encountered during the audit and (ii) the outside auditors' views regarding the Company's financial disclosures, the quality of the Company's accounting principles as applied, the underlying estimates and other significant judgments made by management in preparing the financial statements, and the compatibility of the Company's principles and judgments with prevailing practices and standards;

   o   matters, if any, that must be reported under the federal securities laws (including Section 10A of the Exchange Act); and

- o    communications, if any, with the national office of the outside auditors pertaining to the Company's financial affairs;

- review with management, the internal auditors and the outside auditors:

  - o    the Company's annual assessment of its internal controls and the related written reports required under §404 of the Sarbanes-Oxley Act;

  - o    the adequacy of the Company's internal controls; and

  - o    reports, no less than quarterly, regarding internal control assessment processes under §404 of the Sarbanes-Oxley Act, including reports on any "material weakness" or "significant deficiency" and the Company's remediation steps;

- review with management and the outside auditors major issues regarding accounting principles and financial statement presentations, if any, including (a) significant changes in the Company's selection or application of accounting principles, (b) major issues as to the adequacy of the Company's financial reporting and (c) special audit steps adopted in light of material deficiencies;

- discuss with management and the outside auditors the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements;

- discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures;

- review the accounting implications of significant new transactions, if any.

117. Further, regarding internal controls and compliance oversight, the members of the

Audit Committee owed specific duties to the Company under the Audit Committee Charter to:

- monitor the effectiveness of the Company's procedures for receiving, retaining, and handling confidential, anonymous complaints regarding accounting, controls or auditing matters (maintained under SEC Rule 10A-3);

- discuss any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies;

- review the adequacy of the Company's disclosure controls and procedures;

- review reports on "related party" transactions;

- 44 -

- solicit, as necessary, germane reports or information from the Risk Evaluation Committee or other board committees with related oversights functions;

- review annually the procedures established by the Company to monitor its compliance with debt covenants; and

- consult periodically with counsel concerning the Audit Committee's responsibilities or legal matters that may have a material impact on the Company's financial statements, controls, or corporate compliance procedures.

118. Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Conduct**

119. Additionally, the Individual Defendants, as officers and/or directors of CenturyLink, are bound by the Company's Code of Conduct (the "Code") which, according to the Code, "sets forth the basic principles we must follow to uphold our Company's ethical business culture." Each employee, officer, and director of CenturyLink is covered by the Code.

120. According to the Code, each employee, officer, and director of CenturyLink is required to:

- Accurately record all assets, liabilities, revenues and expenses;

- Follow all internal control procedures;

- Never make false or artificial journal entries; and

- Never establish unsupported reserves or accruals.

121. Further, the Code also provides specific additional responsibilities to "senior financial officers – including, but not limited to, our Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer." These officers "must ensure that the financial information we disclose in public communications and file in the Company periodic reports with the [SEC] is

full, fair, accurate, timely and understandable." In addition, senior financial officers are required

to:

- Help maintain reliable internal controls, assess their quality and effectiveness, implement improvements, and report or resolve weaknesses that could materially affect or render financial disclosures or reports inaccurate;

- Inform the Disclosure Committee of transactions, events or circumstances that could have a material impact on our Company's financial reports;

- Fairly and accurately represent material facts or circumstances when interacting with our auditors and those individuals who prepare our Company's financial statements; and

- Ensure that those who perform accounting or financial reporting functions know and adhere to these principles.

122.    Upon information and belief, the Company maintained a version of the Code during

the Relevant Period that imposed the same, or substantially and materially the same, or similar,

duties on, among others, the Board as those set forth above.

**Control, Access, and Authority**

123.    The Individual Defendants, because of their positions of control and authority as

directors and/or officers of CenturyLink, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public

statements issued by CenturyLink.

124.    Because of their advisory, executive, managerial, and directorial positions with

CenturyLink, each of the Individual Defendants had access to adverse, non-public information

about the financial condition, operations, and improper representations of CenturyLink.

125.    At all times relevant hereto, each of the Individual Defendants was the agent of

each of the other Individual Defendants and of CenturyLink and was at all times acting within the

course and scope of such agency.

- 46 -

**Reasonable and Prudent Supervision**

126.   To discharge their duties, the officers and directors of CenturyLink were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of CenturyLink were required to, among other things:

(a)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)   remain informed as to how CenturyLink conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)   ensure that CenturyLink was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

127.    Each of the Individual Defendants, by virtue of his or her position as a director and/or officer, owed to CenturyLink and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of CenturyLink, as well as in the use and preservation of its property and assets.  The Individual Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CenturyLink, the absence of good faith on their part, and a reckless disregard for their duties to CenturyLink and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to CenturyLink.

128.    The Individual Defendants each breached their duties of loyalty and good faith by allowing to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

129.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of the federal securities laws, and which has now survived a motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). As a result, CenturyLink has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

130.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

131.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

132.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

133.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

134.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO CENTURYLINK

135.    As a result of the Individual Defendants' wrongful conduct, CenturyLink disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.   The improper statements have devastated CenturyLink's credibility.   CenturyLink has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

136.    As a direct and proximate result of the Individual Defendants' actions as alleged above, CenturyLink's market capitalization has been substantially damaged, losing over $10 billion in market value as a result of the conduct described herein.

137.    Further, as a direct and proximate result of the Individual Defendants' conduct, CenturyLink has expended and will continue to expend significant sums of money.   Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending CenturyLink and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b)     costs incurred in investigating and defending CenturyLink and certain officers in the Heiser Complaint, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(c)     costs incurred in investigating and defending CenturyLink and certain officers in the consumer complaint, based on the whistleblower complaint, alleging fraud, unfair competition, and unjust enrichment, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(d)    costs incurred in investigating and defending CenturyLink and certain officers in the complaint filed by Minnesota's attorney general, Lori Swanson, including costs associated with the stipulated order;

(e)    all costs associated with the Special Committee tasked with reviewing the Company's policies, procedures and practices relating to consumer sales, service and billing, as announced by the Company on December 7, 2017;

(f)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on CenturyLink's artificially-inflated stock price; and

(g)    costs incurred from the loss of the Company's customers' confidence in CenturyLink's products.

138.    Moreover, these actions have irreparably damaged CenturyLink's corporate image and goodwill.  For at least the foreseeable future, CenturyLink will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that CenturyLink's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND ALLEGATIONS

139.    Plaintiff brings this action derivatively in the right and for the benefit of CenturyLink to redress injuries suffered, and to be suffered, by CenturyLink as a direct result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  CenturyLink is named as a Nominal Defendant solely in a derivative capacity.

140. Plaintiff will adequately and fairly represent the interests of CenturyLink in enforcing and prosecuting its rights.

141. Plaintiff was a shareholder of CenturyLink common stock at the time of the wrongdoing of which Plaintiff complains, and has been continuously since.

142. Before filing this derivative action, Plaintiff first demanded that the Board take action to investigate the misconduct alleged herein and, if warranted, to commence litigation against the Individual Defendants. Specifically, on September 6, 2017, in accordance with Louisiana law, Plaintiff made a written demand on the Board to investigate and address the misconduct and, if warranted, to commence litigation against the Individual Defendants. A true and correct copy of Plaintiff's demand letter is attached hereto as **Exhibit A**.

143. In response to the Demand, Plaintiff's counsel received a letter dated September 18, 2017 (the "September 18, 2017 Letter"), from Steven W. Usdin, who signed the September 18, 2017 Letter in his capacity as representative of the SLC. Mr. Usdin noted that the SLC had been appointed by the Board to investigate the Demand. The September 18, 2017 Letter further stated: "Because the SLC inquiry into the demands and allegations contained in the demands is ongoing, we request that you defer instituting any legal proceedings until the completion of that inquiry, which is being conducted as expeditiously as possible." A true and correct copy of the September 18, 2017 Letter is attached hereto as **Exhibit B.**

144. Over the following months, Plaintiff's counsel spoke several times on the telephone with Mr. Usdin regarding the SLC's progress investigating Plaintiff's Demand. No substantive updates were provided until Plaintiff's counsel received a letter dated March 2, 2018 (the "March 2, 2018 Letter"), from Mr. Usdin, with an update stating only that the SLC "has been actively engaged in its investigation, including interviewing witnesses and reviewing documents, and is

- 52 -

making progress towards a conclusion," and that such conclusions were expected within 60 days.

A true and correct copy of the March 2, 2018 Letter is attached hereto as **Exhibit C**.

145.    On April 13, 2018, Plaintiff's counsel received a letter (the "April 13, 2018 Letter")

from Mr. Usdin, rejecting the Litigation Demand.  A true and correct copy of the April 13, 2018

Letter is attached hereto as **Exhibit D**.  The April 13, 2018 Letter stated the following:

> As we communicated to you previously, the Board of Directors of CenturyLink,
> Inc. ("CenturyLink") appointed a Special Litigation Committee (the "SLC") to
> investigate the allegations and demands in your derivative-demand letter, and
> similar letters CenturyLink has received.  The SLC was vested with the full
> authority of the Board to take any action that the SLC deemed to be in the best
> interest of the Company.  As originally constituted, the SLC included Martha Bejar
> and Mike Roberts.  Following the Level 3 acquisition, General Kevin Chilton was
> appointed to the SLC.
>
> The SLC conducted an extensive investigation, lasting over seven months.  The
> SLC reviewed, among other items: minutes and materials from the meetings of the
> CenturyLink Board of Directors as well as Director Committees, including the
> Audit Committee, the Risk Evaluation Committee, and the Compensation
> Committee, company policies and procedures, articles, bylaws, charters, directives,
> memoranda, handwritten notes, presentations, training materials, contracts, public
> filings, 10b5-1 plans, billing records, litigation documents, regulatory documents,
> customer complaints, e-mails and chat conversations.  In addition to reviewing
> documents and data, the SLC interviewed 31 witnesses, including employees,
> former employees, Officers, and Directors.   The SLC also consulted with
> independent experts and consultants.
>
> The SLC met frequently with undersigned counsel to discuss the progress of the
> investigation as it developed, review the evidence, assess the credibility of
> witnesses, and determine what additional information and efforts might be
> necessary.  The SLC met a total of 20 times, in addition to the interviews attended
> together and discussions surrounding same. The SLC members and counsel
> discussed the allegations in the derivative-demand letters at length and evaluated
> CenturyLink's best interest.
>
> The SLC has carefully considered the demands made by you and by other
> shareholders.  The SLC found no evidence to support the allegations made in the
> demand letters.   The SLC also considered the institutional changes and
> advancements at CenturyLink as well as the pending litigation and other regulatory
> matters CenturyLink now faces.  In light of all of the information and relevant
> considerations, and the legal standards set forth in La. R.S. 12:1-830 *et seq.* and La.
> R.S. 12:1-840 *et seq.,* as well as other relevant statutes, the SLC has determined
> that it is not in the best interest of CenturyLink to pursue litigation against any

Directors, Officers, or employees of the company, or to act on any of the demands made on the company. Accordingly, pursuant to La. R.S. 12:1-740 *et seq.,* the SLC is rejecting your demand.

146.    The Board's refusal of Plaintiff's Demand was both unreasonable and conclusory. The April 13, 2018 Letter fails to provide information regarding the scope of the investigation, and does not explain what criteria were used to evaluate the Company's business practices, reporting, procedures, oversight, and internal controls. Based on this refusal, it is impossible to evaluate whether the SLC adequately investigated, as Plaintiff demanded, whether the Company's officers and directors breached their fiduciary duties to the Company by issuing or causing to issue false and misleading statements on behalf of the Company. Plaintiff's Demand specifically required an independent internal investigation into wrongdoing allegations contained in the various class actions that have been brought against the Company. The consolidated class action complaint in the Consolidated Action was not filed until February 15, 2018, and there is no indication that the investigation included any evaluation of those allegations. Accordingly, the SLC and the Board did not act on the basis of all reasonably-available information, and ignored Plaintiff's specific demand to fully investigate the false and misleading statements alleged herein.

147.    Furthermore, the formation of the SLC taints its investigation. Initially, as reported in the Company's August 7, 2017 Form 10-Q, the Board formed a special committee in June of 2017 to investigate the acts underlying the Plaintiff's Litigation Demand. As noted in the August Form 10-Q:

> In June 2017, a former employee filed an employment lawsuit against us claiming that she was wrongfully terminated for alleging that we charged some of our retail customers for products and services they did not authorize. Shortly thereafter, and based in part on the allegations made by the former employee, a series of consumer and shareholder putative class actions were filed against us and we received a shareholder derivative demand. The Minnesota Attorney General also filed a civil suit on behalf of Minnesota consumers alleging that we engaged in improper sales and billing practices. The filing of additional related lawsuits is possible. In late June 2017, the Board of Directors formed a special committee of outside directors

to investigate alleged improper sales and billing practices and related matters. The special committee is in the early stages of its investigation.

148.    Then, in its November 9, 2017 Form 10-Q, the Company announced the SLC had been formed in August of 2017. Specifically, the November Form 10-Q stated:

> In June 2017, a former employee filed an employment lawsuit against us claiming that she was wrongfully terminated for alleging that we charged some of our retail customers for products and services they did not authorize. Starting shortly thereafter and continuing since then, and based in part on the allegations made by the former employee, a series of consumer and shareholder putative class actions were filed against us, and we received several shareholder derivative demands. In July 2017, the Minnesota Attorney General also filed a civil suit on behalf of the Minnesota consumers alleging that we engaged in improper sales and billing practices. The filing of additional related lawsuits is possible. The consumer putative class actions have been transferred to the U.S. District Court for the District of Minnesota for coordinated and consolidated pretrial proceedings. The shareholder putative class actions have been consolidated into a single action that currently is pending in U.S. District Court for the Western District of Louisiana. In addition, a separate, related class action has been filed in U.S. District Court for the Southern District of New York purportedly on behalf of persons who purchased certain of our Senior Notes. In late June 2017, the Board of Directors formed a special committee of outside directors to investigate improper sales and billing practices and related matters. In August 2017, the Board of Directors formed a special litigation committee of outside directors to address the allegations of impropriety contained in the shareholder derivative demands. Both investigations are ongoing.

149.    It is Plaintiff's belief that the SLC's investigation was merely a continuation of and tainted by the original special committee's investigation. In fact, it is Plaintiff's belief that the original special committee and the SLC were both initially comprised solely of Defendants Bejar and Roberts. Furthermore, Defendant Chilton was not added to the SLC until November of 2017 approximately three months after the formation of the SLC and approximately five months after the formation of the special committee. Thus, the "SLC investigation" was not even completely undertaken by those directors purportedly comprising the SLC.

150.    The April 13, 2018 Letter also lacks key information regarding the SLC's process, reasoning, and conclusions in conducting its investigation. For example, the April 13, 2018 Letter

states that the SLC interviewed 31 witnesses, but does not identify those witnesses or provide information regarding the scope of the interviews. The April 13, 2018 Letter also fails to provide a full written report by the SLC regarding its findings, witness summaries, or any detailed information regarding the specific documents reviewed by the SLC.

151.    Further, while the April 13, 2018 Letter states that "the SLC has determined that it is not in the best interest of CenturyLink to pursue litigation against any Directors, Officers, or employees of the company", the letter fails to weigh the potential recovery from any lawsuit in a way that would allow the Board to compare a lawsuit to the costs, and fails to consider the specific merits of bringing suit against any of the individual officers and directors identified in Plaintiff's Demand.

152.    The limited nature of the SLC's investigation is unsurprising in light of the biases of the Defendants leading it: Defendants Bejar, Chilton, and Roberts. Defendants Bejar and Roberts were identified in Plaintiff's Demand as directors that appeared to have breached their fiduciary duties to the Company by issuing false and misleading statements on behalf of the Company and/or completely failing to discharge their designated duties and responsibilities. Indeed, Defendants Bejar and Roberts signed the Company's annual Form 10-Ks filed with the SEC which, as alleged herein, contained materially false or misleading information regarding the quality and effectiveness of the Company's internal controls and the completeness of the Company's disclosures.

153.    In addition, Defendants Bejar and Chilton were both members of the Company's Audit Committee. The Company's Audit Committee is charged with reviewing the Company's financial statements, as well as monitoring the adequacy of the Company's internal controls. As such, as members of the Audit Committee, Defendants Bejar and Chilton must have known, or

were reckless in not knowing, that the Company's public statements were false and misleading, and that the Company's internal controls were inadequate, and were therefore incapable of conducting a disinterested investigation into Plaintiff's Demand.

154.    The Board's actions in response to Plaintiff's Demand demonstrate the Board's desire to achieve a predetermined result – a refusal of the demand.  The Board deferred the investigation of Plaintiff's Demand to conflicted SLC members who had personal interests in making the recommendation the Board wanted – a refusal of the Demand.  The SLC failed to act independently in determining that the Plaintiff's Demand should be rejected.  The SLC was comprised of some of the same individuals that were implicated in the wrongdoing:  Defendants Bejar and Roberts reviewed, approved, and/or signed statements that contained the improper representations alleged herein.

155.    Similarly, the directors who ultimately rejected Plaintiff's Demand are also implicated in the wrongdoing complained of herein for their role in allowing misleading statements and filings to be issued and disseminated, and by allowing omissions to remain undisclosed, as alleged herein.  At the time this action was commenced, the Board of CenturyLink consisted of the following thirteen (13) directors: Post, Storey, Bejar, Boulet, Brown, Chilton, Clontz, Glenn, Hanks, Landrieu, Perry, Roberts, and Siegel.  The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors during the Relevant Period, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

156.    The Board's refusal of the Demand is unreasonable and the Individual Defendants have failed to conduct a reasonable inquiry and failed to act in good faith, on an informed basis,

or in the honest belief that the refusal was in the best interest of the Company.  Therefore, Plaintiff reasonably believes that the Board's refusal is not a valid exercise of business judgment.

157.    CenturyLink has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against any persons who were responsible for the wrongful conduct.   Thus, the Director Defendants continue to breach their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches.

158.    If CenturyLink's officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this Complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders.  However, Plaintiff reasonably believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by CenturyLink against the Individual Defendants, known as the "insured versus insured exclusion."

159.    As a result, if the Director Defendants were to sue themselves or certain of the officers of CenturyLink, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

160.    Plaintiff has not made any demand on shareholders of CenturyLink to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     CenturyLink is a publicly-traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

(b)     Making a demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of CenturyLink shareholders; and

(c)     Making a demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

161.    Given the Board's unreasonable refusal of Plaintiff's lawful demand to sufficiently investigate the misconduct and/or to take sufficient action to remedy the harms caused to the Company, Plaintiff now files this Complaint.

## COUNT I

## AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    The Individual Defendants owed and owe CenturyLink fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe CenturyLink the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

164.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

165.    The Individual Defendants each knowingly, recklessly, or negligently: (i) made false or misleading statements that misrepresented or failed to disclose material information

concerning the Company; (ii) approved the issuance of such false and/or misleading statements; (iii) failed to take actions to correct such false and/or misleading statements after they had been disseminated by the Company; (iv) failed to act independently and with due care in rejecting the Demand; and/or (v) failed to address the misconduct. These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

166.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, CenturyLink has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

167.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## COUNT II

## AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

168.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CenturyLink.

170.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to CenturyLink.

171.    Plaintiff, as a shareholder and representative of CenturyLink, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

172.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## COUNT III

## AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

175.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

176.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

177.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## COUNT IV

## AGAINST DEFENDANTS EWING, COLE, BOULET, BROWN, PERRY, AND SIEGEL FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

178.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.    At the time each of the Insider Selling Defendants sold his or her CenturyLink stock, he or she knew the material, non-public information described above, and sold CenturyLink stock on the basis of such information.

180.    The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in CenturyLink stock.  Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of CenturyLink stock.

181.    The Insider Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to CenturyLink for insider trading.

182.    Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

183.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' illegal insider stock sales, breaches of fiduciary duties, unjust enrichment, and waste of corporate assets;

B.    Directing CenturyLink to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect

CenturyLink and its shareholders from a repeat of the damaging events described herein, including but not limited to putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a provision to permit shareholders of CenturyLink to nominate at least three candidates for election to the Board to replace existing directors;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of CenturyLink's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

C.    Awarding to CenturyLink restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  June 6, 2018                            Respectfully submitted,

                                               **O'BELL LAW FIRM, LLC**

                                               */s/ Eric J. O'Bell*
                                               Eric J. O'Bell
                                               3500 North Hullen Street
                                               Metairie, LA 70002
                                               Telephone: (504) 456-8677
                                               Facsimile: (504) 456-8653
                                               ejo@obelllawfirm.com


                                               **BRAGAR EAGEL & SQUIRE, P.C.**
                                               Lawrence P. Eagel
                                               David J. Stone
                                               Melissa A. Fortunato
                                               Todd H. Henderson
                                               885 Third Avenue, Suite 3040
                                               New York, New York 10022
                                               Telephone: (212) 308-5858
                                               Facsimile: (212) 214-0506
                                               eagel@bespc.com
                                               stone@bespc.com
                                               fortunato@bespc.com
                                               henderson@bespc.com

                                               *Attorneys for Plaintiff*

- 64 -